## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| JOSEPH HOWARD, | |
|     Plaintiff, | |
| v. | Case No. 2:10-cv-932-MEF<br>(WO—Publish) |
| STERIS CORPORATION, | |
|     Defendant. | |

### MEMORANDUM OPINION & ORDER

### I. INTRODUCTION

Joseph Howard ("Howard") filed suit against his former employer, STERIS Corporation ("STERIS"), claiming disability and age discrimination. Now the case comes before the Court on two motions filed by STERIS. The first is a garden variety motion for summary judgment that contests the sufficiency of the evidence produced by Howard. (ECF No. 26.) The second asks for summary judgment on collateral estoppel grounds. (ECF No. 28.) For the reasons discussed below, the former is due to be GRANTED and the latter DENIED.

### II. JURISDICTION & VENUE

The Court has jurisdiction over Howard's claims under 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights). The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b). The Court finds adequate allegations supporting both contentions.

### III. Summary Judgment Standard

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A plaintiff, indeed, must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations

without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. FACTUAL & PROCEDURAL BACKGROUND

### A.    Background—STERIS Corporation and Joseph Howard

STERIS Corporation makes surgical tables, cabinets, and lights at its facility in Montgomery, Alabama. (Thomas Aff. ¶ 4, ECF No. 27-1.) Malcolm McBride ("McBride")—known as "Mac" to STERIS's employees—served as the Montgomery facility's Director of Operations. (McBride Dep. 19–21, ECF Nos. 27-2 to -3.) In this position, he was the final decisionmaker on all matters related to employee discipline. (*Id.* at 20–21.) Ken Thomas ("Thomas") worked at the Montgomery facility, too, and was the Senior Human Resources Manager there. (Thomas Aff. ¶ 2.)

Joseph Howard began working for STERIS as a grinder in 1985. (Howard Dep. 53, ECF Nos. 27-15 to -20.) Four year later, he moved to assembler, a position in the Case Work Department. (*Id.* at 57.) There he built the upper and lower heating units on medical warming cabinets, which hospitals use to store warm towels and blankets. (*Id.* at 63–65.)

From 2003 to 2009, Howard reported to supervisor Jimmy Williams ("Williams"). (*Id.* at 58–60.) The two got along fine during that time. (*Id.* at 60.) His coworkers in the

Case Work Department were Randy Bush, Mike Rucker, and Tommy Skipper. (*Id.* at 59.) The men typically built the warming cabinets on a small assembly line called a "cell." (*Id.* at 64.) The cell had four different work stations, each used for assembling a different part of the cabinets. (*Id.* at 65–67.)

**B.      STERIS's rules, regulations, and policies**

STERIS distributed the company's *Montgomery Employee Handbook* to all of its employees at the Montgomery facility. The manual contained a comprehensive set of policies related to discrimination in the work place. It touched on discrimination based on race, color, religion, ancestry, age, sex, national origin, disability, and any other characteristic protected by law:

> It is the policy of STERIS Corporation to provide a workplace free from illegal discrimination. All employment decisions at STERIS will be based on merit, qualifications, and abilities without regard to race, color, religion, ancestry, age, sex, national origin or disability. Discrimination against any individual on these bases or any other characteristic protected by law is prohibited and will not be tolerated. This affects decisions including but not limited to recruitment and selection, placement, training, compensation, benefits, promotions, transfers, terminations from employment, and other aspects of employment.
>
> STERIS Corporation will make reasonable accommodations for qualified individuals with known disabilities unless doing so would result in an undue hardship.

(Thomas Aff. ¶ 5, Ex. A.) STERIS even had a separate policy discussing its commitment to compliance with the Americans with Disabilities Act:

> It is the policy and practice of STERIS Corporation to comply
> fully with the Americans with Disabilities Act (ADA) and
> ensure equal opportunity in employment for all qualified
> persons with disabilities. STERIS is committed to ensuring
> nondiscrimination in all terms, conditions, and privileges of
> employment. Employment practices and activities will be
> conducted in a nondiscriminatory manner.
>
> STERIS is committed to taking actions necessary to ensure
> equal employment opportunity for persons with disabilities in
> accordance with the ADA and other applicable federal, state,
> and local laws.

(*Id.* at ¶ 6, Ex. B.)

The *Montgomery Employee Handbook* also listed work rules, discussed appropriate workplace conduct, and addressed discipline for violations. To this end, it listed examples of employee misconduct that might result in immediate termination, specifically including "sleeping on the job" in that section. (*Id.* at ¶ 7, Ex. C.) Yet STERIS declined to write rigid rules or use a zero tolerance approach to violations, opting instead to reserve the right to make decisions "in a manner other than provided in this section." (Thomas Dep. Ex. 16; McBride Dep. 53–54.)

This gave McBride, the final decisionmaker on disciplinary matters, some flexibility to weigh the specific circumstances and create precedent for discipline. (McBride Dep. 54.) One rule that emerged was that anyone caught sleeping on the job would be fired after the first offense—but only if two supervisors independently confirmed the violation. (Thomas Aff. ¶ 8; Thomas Dep. 59–60, 74, ECF Nos. 27-4 to -14.) STERIS followed this policy consistently. (Thomas Aff. ¶ 9; McBride Dep. 41, 47–48.) For example, in 2002, STERIS fired Gary Teel, Danny Bryant, and Harold Jones for sleeping in the job. (Thomas Aff. ¶ 9; Thomas Dep. 72–74.) When STERIS fired them,

the men were 39, 48, and 49 years old, respectively; none of them had a known disability. (Thomas Aff. ¶ 9.)

## C.    Howard's medical history

Howard had issues with daytime sleepiness and difficulty sleeping at night ever since he attended high school. (Howard Dep. 101–04.) He first sought treatment for these problems in 1973 when he visited his physician, Dr. James Capel. (*Id.* at 101.) Dr. Capel told Howard that he might have narcolepsy and gave him some caffeine pills to combat his drowsiness. (*Id.* at 102, 105–06.) He also told Howard that he had "vampire tendencies" because he could stay up all night and sleep all day. (*Id.* at 102.) Dr. Capel never created a record documenting either finding. (*Id.* at 106.)

Howard did not seek treatment again for his sleeping issues until February of 2009—more than 30 years after seeing Dr. Capel. (*Id.* at 109–10.) Howard's condition had worsened since his initial visit: he "could not sleep at night, could not stay alert," and "would drift during [] idle time" at work. (*Id.* at 110.) By midyear, Howard was only getting four to five hours of sleep a night (*id.* at 172), and he experienced dizziness, headaches, and had difficulty concentrating during the day (*id.* at 141).

Because his condition had worsened, Howard went to see his primary physician, Dr. Carpenter, to ask for a sleep study. (*Id.* at 110.) After examining Howard, Dr. Carpenter diagnosed him with Graves' Disease, a condition caused by an overactive thyroid. (*Id.* at 143–45.) The examination revealed that Howard had heart problems too. (*Id.*) Because he thought that starting treatment for Howard's thyroid and heart conditions was more important than the sleep study, Dr. Carpenter did not treat Howard for his daytime sleepiness. (*Id.* at 110, 146.)

In May of 2009, Dr. Carpenter referred Howard to Dr. Casals, an endocrinologist, to treat his Graves' Disease. (*Id.* at 15, 37, 145–46.) Dr. Casals in turn prescribed Tapazole to Howard to regulate his overactive thyroid. (*Id.* at 145–46.) She did not, however, place Howard on work restriction, nor did Dr. Carpenter. (*Id.* at 157–58.) Moreover, neither doctor ever prescribed Howard any medicine for narcolepsy. (*Id.* at 136.)

**D.     Howard's condition at work**

Howard never told any of his supervisors that he thought he had narcolepsy. (Howard Dep. 129–30.) He declined to do so because he found his condition embarrassing. (*Id.* at 131–32.) He did, however, fall asleep quite often at plant-wide meetings attended by his supervisors. (*Id.* at 130–31.) In fact, some of his former coworkers recall Howard dozing off at almost every meeting. (Duncan Decl. ¶ 5, ECF No. 33-37; O. Thomas Decl. ¶ 5, ECF No. 33-38; Holston Decl. ¶ 2, ECF No. 33-40.) One of those coworkers, Otto Thomas, even said that if they "had meetings of only 15 to 20 minutes, nine times out of ten, Joe [Howard] was going to nod off." (O. Thomas Decl. ¶¶ 5, 8.)

There were plenty of instances where Howard fell asleep during plant-wide meetings. For example, in late 2004 or early 2005, STERIS held a cost reduction meeting with high-ranking, out-of-state corporate officials. Howard fell asleep during that meeting, irritating plant manager McBride so much so that he made fun of Howard publicly. (Howard Decl. ¶ 13; Holston Decl. ¶ 7; O. Thomas Decl. ¶ 9.) And in 2007 or 2008, the HR director, Ken Thomas, conducted a benefits and insurance meeting in which a sleeping Howard nearly fell out of his chair. (Howard Dep. 130–31; O. Thomas Decl. ¶

9.) On yet another occasion—this time in 2008—Howard drifted off while sitting right next to his direct supervisor, Jimmy Williams. (Howard Decl. ¶ 21, ECF No. 34-1.)

Howard also made statements in front of coworkers and Williams about his sleepiness. For instance, after a coworker asked him about falling asleep at work, he once said, "what I do, I can't help it." (Howard Dep. 129.) And when he would explain to others that he had issues with drowsiness, he would say, "Hey, I've got a problem, y'all will just have to excuse me, I can't help what I do." (*Id.* at 130.) But these statements were "the extent of the discussion" about his sleepiness problem. (*Id.* at 131.) He never specifically asked for an accommodation for his narcolepsy or for his Graves' Disease. (*Id.* at 134–35.) He failed to do so because he could do his job just fine, even with his medical conditions. (*Id.* at 132.) He also thought that STERIS had already accommodated him by allowing his coworkers to spray him with water or scare him when they noticed him sleeping on the job. (*Id.* at 116, 128–29, 134.)

## E.    STERIS's 2009 reduction in force program

In June of 2009,[1] STERIS initiated a reduction in force program. (Howard Dep. 188.) It did so as a cost-saving measure—its customers were suffering from uncertainty about the regulatory and tax burdens the newly proposed healthcare law would create,

---

[1] The parties dispute when STERIS started the reduction in force program. The company claims they offered it on May 15, 2009, and gave eligible employees until May 22, 2009, to volunteer to participate. (Thomas Aff. ¶ 10; Thomas Dep. 35–37.) The company also contends that although Howard met the eligibility requirements at the time, he did not volunteer before the May 22 deadline and would not have been eligible anyway after he was caught sleeping on the job. (Thomas Aff. ¶¶ 11–12.) But Howard disputes all of this. He claims that he heard about the program in a plant-wide meeting in June of 2009. (Howard Dep. 188.) And while he does not give the exact date, he testified that the meeting took place sometime before his firing on June 11, 2009. (*Id.*) Because this is a motion for summary judgment, the Court has taken Howard's version of the facts—that STERIS offered the early retirement option sometime in early June—as true. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

and this in turn slowed STERIS's medical equipment sales. (Thomas Dep. 36.) Seeking to cut 20 workers, the company offered a group of qualifying employees an opportunity to participate in the reduction in force program. (Thomas Aff. ¶ 10.) To qualify, an employee had to have worked for STERIS for more than 15 years. (Howard Dep. 258–59.) Any qualified employee that volunteered would get paid for a period of weeks for each year of service with the company, up to a maximum of 26 weeks. (Thomas Aff. ¶ 10.)

**F.    Howard is caught sleeping on the job, suspended, and fired**

Supervisor Randy Bridges ("Bridges") caught Howard sleeping at his workstation on June 11, 2009. He responded by contacting Jimmy Williams and reporting what he had seen. (Williams Dep. 46.) Williams then walked toward Howard's workstation and saw Howard slumped over, apparently asleep in his chair. (*Id.* at 47.) Williams grabbed Howard's shoulder to wake him up, and when Howard awoke, Williams asked him if he was "all right." (*Id.* at 48–49.) Howard responded by telling Williams that he was taking a thyroid medication that made him "feel bad" right after taking it. (Howard Dep. 175; Williams Dep. 48.) Williams then looked at Howard's workstation at this point and spied a bag of medicine from CVS sitting there. (Williams Dep. 43.)

After Bridges and Williams saw Howard sleeping, Bridges fired off an email to his manager, Danny Shipp ("Shipp"). (Thomas Dep. 49, Ex. 4.) Shipp forwarded the email to Thomas to let him know what had happened. (Thomas Dep. 49, Ex. 6.) A bit later, Thomas met with Bridges and Williams to confirm that they had observed Howard sleeping on the job. (Thomas Dep. 52.)

Howard met with Williams and Thomas that afternoon. (Williams Dep. 61.) The meeting began with Williams describing how he saw Howard sleeping. (*Id.* at 66.) And

Thomas proceeded to tell Howard that he had decided to suspend him "in keeping with company policy." (Howard Dep. 185.) Howard showed Thomas his medication for his Graves' Disease, but to no avail—Thomas still asked Howard for his badge and told Williams to escort him to his car. (*Id.* at 185, 192.)

Before leaving, Howard asked Thomas if he could take voluntary early retirement if the investigation into his misconduct didn't go his way.[2] (*Id.* at 186–87.) Thomas agreed, telling Howard that he could opt into the Early Out Program if that happened. (*Id.* at 187–88.) At this point, Williams escorted Howard to the parking lot. (*Id.* at 192.) During the walk, Williams asked him if he had a sleeping disorder, trouble staying awake, or if maybe he had seen a doctor about whether he had narcolepsy. (Williams Dep. 27.) Howard replied that he had not seen a doctor about his sleepiness, though his coworkers had urged him to do so for some time. (*Id.*; Howard Dep. 199.)

After Thomas suspended Howard, he met with Williams, Bridges, Shipp, and McBride that same day. During the meeting, McBride asked Thomas to take a look at the circumstances surrounding the firing of other employees who had fallen asleep on the job; he also told Thomas to contact legal counsel. (Thomas Dep. 55–56, 70–72.) Thomas then undertook a brief investigation and contacted a lawyer as McBride had instructed. (*Id.* at 70.)

The same group met again the next day. (McBride Dep. 70–72.) Based on Howard's misconduct and the company's past practice of firing other employees found sleeping at their workstations, McBride decided to fire Howard. (*Id.*) When he made the

---

[2] According to Thomas, he told Howard that STERIS did not offer an early retirement program, and he reminded Howard that although the Montgomery plant had offered a voluntary reduction in force a few weeks earlier, the deadline for participating had come and gone. (Thomas Aff. ¶ 12.) The Court has credited Howard's version of the facts because the testimony of the two men conflict.

decision, he did not know that Howard suffered from narcolepsy. (*Id.* at 59–63.) But he did know that Howard was taking some sort of medication around the time he was found sleeping at his workstation. (*Id.* at 65.)

Right after the meeting, Thomas and Williams called Howard to fire him for sleeping on the job. (Thomas Dep. 100–01, 107, Ex. 9.) During the call, Williams read a termination letter to Howard. (Thomas Dep. 101.) Then Thomas gave Howard some phone numbers for local businesses in need of employees and told Howard that he would personally give him a good recommendation. (*Id.* at 102–03.) Thomas also told Howard that he should look into applying for unemployment benefits and informed him that he had the right to appeal the firing decision. (*Id.* at 104–05.) Howard never mentioned his narcolepsy, Graves' Disease, or his medications during the call, although sometime before the discussion, he faxed Thomas some documents showing that he was taking medication for Graves' Disease. (Howard Dep. 201.) Thomas never received those documents, however. (Thomas Dep. 96.)

**G.    After Howard's firing**

Two weeks after STERIS fired Howard, he requested a meeting with McBride to appeal the decision. (Howard Dep. 216–19.) McBride scheduled the meeting for 2:00 p.m. the following Thursday. (*Id.* at 219.) Howard decided not to show up, however, because he didn't think McBride would change his mind. (*Id.* at 219, 226.) He never tried to reschedule the meeting, presumably for the same reason. (*Id.* at 226.)

On June 23, 2009, Howard went to see Dr. David Franco for his daytime sleepiness. (Franco Dep. 10, ECF Nos. 27-22 to -23.) Dr. Franco decided to evaluate Howard's sleep with polysomnography testing, which Howard underwent on September 23 and 29, 2009. (*Id.* at 23–24, 100, Ex. 1.) After getting back the test results, Dr. Franco

diagnosed Howard with moderate sleep apnea. (*Id.* at 23.) He did not diagnose Howard with narcolepsy. (*Id.* at 13; Howard Dep. 148.)

Meanwhile, Howard had filed for unemployment compensation benefits with the Alabama Department of Industrial Relations (ADIR). (Howard Dep. 234.) The ADIR initially granted Howard's benefit request, and STERIS appealed. (*Id.* at 234, 236, Ex. 4.) The agency held a hearing before an Administrative Hearing Officer, which included live testimony from both Howard and Thomas. (*Id.* at 235–36.) After the hearing, the Hearing Officer prepared a written determination, finding that Howard had "not informed [STERIS] of his condition prior to being discovered sleeping on June 11, 2009." (*Id.* at Ex. 4.) The officer concluded that an employer "has the right to expect an employee not to sleep on the job," and that STERIS fired Howard based on his misconduct. (*Id.*) In keeping with this finding, the ADIR denied Howard's claim for unemployment benefits. (*Id.*)

On November 1, 2010, Howard filed suit in federal court, alleging four different violations of federal employment law. First, he claimed that STERIS violated the Americans with Disabilities Act (ADA) by firing him because of his disability and by refusing to grant to him reasonable accommodations. Second, he alleged that STERIS violated the antiretaliation provisions of both the ADA and Age Discrimination in Employment Act (ADEA) by opposing his request for unemployment benefits. Third, he claimed STERIS violated the ADEA by firing him because of his age. Fourth, and finally, he asserted claims under Alabama's Age Discrimination in Employment Act (AADEA), which essentially mirrored the claim he brought under the ADEA.

## V. Discussion

STERIS asks for summary judgment on all of Howard's claims. The company argues that Howard's unemployment compensation hearing, which resulted in the Alabama Department of Industrial Relations denying his claim because he violated a work rule, bars relitigation of his ADA and ADEA claims. The Court will address this argument first because it could potentially extinguish Howard's entire lawsuit. But since the argument fails, the Court will go on to discuss the various theories under which Howard tries to recover under the ADA, the ADEA, and state law.

### A.    Collateral estoppel

STERIS argues that the Court should grant summary judgment based on collateral estoppel (also known as issue preclusion). The company contends the ADIR already decided the dispositive issues in this case when it found, first, that Howard did not tell STERIS about his alleged disability, and second, when it concluded that he was fired for sleeping on the job. STERIS argues that he therefore cannot relitigate these issues now. Howard responds by noting how he declined to appeal the ADIR's decision and argues that federal courts cannot give preclusive effect to unreviewed agency determinations—at least not when it comes to ADA and ADEA claims.

Howard has the better of the argument here. As a general rule, the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to give state court judgments preclusive effect so long as the State's courts would do so too. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982)); *Ross v. Renaissance Montgomery Hotel & Spa*, No. 2:11-cv-301, 2012 WL 1032618 (M.D. Ala. Mar. 27, 2012). But the Act does not apply to unreviewed administrative decisions. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 794 (1986).

Still, federal courts sometimes give unreviewed agency decisions preclusive effect under the federal common law rules of preclusion. The common law rules do not apply, though, if Congress decides to override them by statute. *See Jones v. Hamic*, ___ F. Supp. 2d ___, No. 1:10-cv-202, 2012 WL 2872084, at *7–10 (M.D. Ala. July 13, 2012) (Fuller, J.) (discussing three-part test for finding unreviewed agency decisions can have preclusive effect). For example, in *University of Tennessee v. Elliott*, the Supreme Court held that Congress intended to override the established preclusion rules when it passed Title VII, because while the statute requires the EEOC to give weight to state agency decisions, it does not require the agency to accept them wholesale. 478 U.S. 788. Thus, the Court reasoned, "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court." *Elliott*, 478 U.S. at 795.

Relying on *Elliott*, the Supreme Court later found that unreviewed administrative decisions have no preclusive effect over age discrimination claims. *Astoria Federal Savings & Loan v. Solimino*, 501 U.S. 104 (1991). The *Astoria Federal* Court noted how Congress likely intended to roll back the general rules of preclusion when it passed the ADEA, reasoning that, "[w]hile the statute contains no express delimitation of the respect owed to state agency findings, its filing requirements make clear that collateral estoppel is not to apply." *Id.* at 110–11. Because *Astoria Federal* seems directly on point, and since STERIS has not tried to distinguish it from the case at hand, the Court holds that Howard is not collaterally estopped from relitigating the reasons for his firing as they relate to his ADEA claim.

The effect of the ADIR's unreviewed findings on Howard's ADA claims is a closer question. On the one hand, the ADA uses the same enforcement procedures as Title VII,

so *Elliott*'s reasoning seemingly applies to ADA claims. Every federal circuit court of appeals that has addressed the issue has taken this position. *See, e.g.*, *Pernice v. City of Chicago*, 237 F.3d 783, 787 n.5 (7th Cir. 2001) ("Because Title I of the ADA incorporates the same deferral procedures [as Title VII], *Elliot*'s reasoning applies equally to ADA cases."); *Thomas v. Contoocook Valley Sch. Dist.*, 150 F.3d 31, 39 n.5 (1st Cir. 1998) ("the ADA incorporates the same Title VII deferral procedures . . . on which the Supreme Court relied in . . . *Elliott*; therefore, those holdings apply with equal force in the ADA context."); *Joseph v. Athanasopoulos*, 648 F.3d 58, 64 n.6 (2d Cir. 2011) ("we are aware of no distinction between [Title VII and the ADA] that would require affording a state court judgment a different preclusive effect"); *Stone v. Dep't of Aviation*, 290 F. App'x 117, 123 n.3 (10th Cir. 2008); *Medeiros v. City of San Jose*, 188 F.3d 514 (9th Cir. 1999) (unpublished table decision). On the other hand, allowing a plaintiff who has already litigated the dispositive issue to forego appealing the agency decision so he can avoid a preclusive state court judgment forces the hapless employer to pay to defend its actions twice, with one of those times coming after the State has already deemed them lawful. This raises the nuisance value of frivolous lawsuits and thereby encourages wasteful litigation. It also requires the federal courts to second-guess the outcomes produced by a State's legal systems—all without a statute expressly dictating that result. Nevertheless, one cannot ignore the weight of authority holding that unreviewed state administrative decisions cannot have preclusive effect on ADA claims. And given the similarity between the deferral procedures in Title VII and the ADA, the Court finds it prudent to extend *Elliott*'s reasoning to ADA claims. Accordingly the Court holds that the ADIR's findings do not preclude Howard from relitigating the reasons for his firing as they relate to his ADA claims.

**B.      Howard's Americans with Disabilities Act claims**

The Americans with Disabilities Act (ADA) prohibits discrimination based on disability. More specifically, the ADA bars covered employers from discriminating against "a qualified individual on the basis of disability" in the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a) (2000) (amended 2008). The statute further "imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer." *Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996). Joseph Howard claims that STERIS violated this law (1) when the company fired him after two supervisors allegedly saw him sleeping at his workstation; (2) by not offering him a reasonable accommodation for his disability; and (3) by retaliating against him for complaining about his treatment. The Court will address each of these three claims in turn.

**1.      Howard's disparate treatment claim**

Howard bears the burden of establishing a prima facie case of disability discrimination. *Holbrook v. City of Alpharetta*, 112 F .3d 1522, 1526 (11th Cir. 1997). If he meets this burden, STERIS must then provide a legitimate, non-discriminatory reason for the challenged action. *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004). If STERIS provides a legitimate, non-discriminatory reason, the burden would then shift back to Howard, requiring him to produce substantial evidence that the proffered reason is a lie used to cover up intentional discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008); *Chapman v. AI Transport*, 229 F.3d 1012, 1024–25 (11th Cir. 2000).

To establish a prima facie case, Howard must prove that "(1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th

Cir. 2000). A person has a disability if he "has a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(1)(A) (2000) (amended 2008); 29 C.F.R. § 1630.2(g) (2011). And a "qualified individual with a disability" is someone who can perform the "essential functions" of the job, "with or without reasonable accommodation." 42 U.S.C. § 12111(8). An employer unlawfully discriminates against a qualified individual with a disability by taking adverse action against him because of the disability, or by failing to provide "reasonable accommodations" for the disability, unless doing so would impose an undue hardship on the employer. *Id.* § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).

As mentioned, a person has a disability if he has a physical impairment that substantially limits one or more major life activities. The Equal Employment Opportunity Commission (EEOC) has defined a "physical impairment" as "any physiological disorder or condition . . . affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1) (2011). In addition, the ADA Amendments Act of 2008 (ADAAA) rejected the Supreme Court's decision in *Toyota Motor Manufacturing v. Williams*, which held that the term "major life activities" referred only to activities of "central importance to most people's daily lives." 534 U.S. 184, 198 (2002). Now, under the ADAAA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, *sleeping*, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12101(2)(A) (emphasis added).

This expanded list, for better or worse, makes a person afflicted with a common, minor condition "just as disabled as a wheelchair-bound paraplegic—if only for the purposes of disability law." *Lloyd v. Montgomery Hous. Auth.*, ___ F. Supp. 2d ___, No.

2:10-cv-1103, 2012 WL 1466561, at *7 (M.D. Ala. Apr. 27, 2012) (Fuller, J.). Even so, "the ADAAA left untouched the plaintiff's burden of proof; he still has to prove he has a disability." *Id.* Here, Howard has met his initial burden of showing he has a disability. His pulmonologist and sleep specialist, Dr. Franco, diagnosed him with obstructive sleep apnea and stated that it "definitely" interferes with Howard's ability to sleep. (Franco Dep. 11, 52, 56, 60.) And his regular physician, Dr. Carpenter, diagnosed Howard with Graves' disease, which can cause trouble sleeping too, according to Dr. Casals, his endocrinologist. (Casals Dep. 27–28, 40–41.) This testimony provides a reasonable juror with enough evidence to conclude that Howard's physical impairments substantially limited his ability to sleep, a major life activity under the ADAAA. 42 U.S.C. § 12101(2)(A).

Since liability under the ADA requires the employer to have discriminated *because of* the employee's disability, it follows that the employee must show the employer knew of his alleged disability at the time it took the adverse employment action. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242–43 (11th Cir. 2001). That is, "[a]n employee cannot be fired 'because of' a disability unless the decision maker has *actual* knowledge of the disability." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005). With this in mind, STERIS argues that none of the decisionmakers involved in Howard's firing knew that he suffered from a physical condition that substantially affected his ability to sleep. The company notes that Howard neither told McBride nor Thomas—the ultimate decisionmaker and a key participant in his firing—that he thought he suffered from narcolepsy or any other medical condition. Howard responds by asserting that they knew enough about his symptoms to provide constructive notice of his disability. Besides,

Howard argues, Williams knew about him sleeping during meetings yet failed to mention it when he participated in the firing decision with McBride and Thomas.

But Howard does not cite a single piece of binding legal authority for the proposition that an employer has the duty to divine an employee's disability based on circumstantial evidence. This is likely because the Eleventh Circuit has always held to the contrary. For instance, in *Moriskey v. Broward County*, the plaintiff did not tell her supervisors about her "*specific* disability." 80 F.3d 445, 448 (11th Cir. 1996) (emphasis added). Instead, she tried to rely on how she had told her supervisors she could not read and that she had taken special education courses in the past, arguing that this information gave her employer sufficient notice that she had cerebral palsy. *Id.* The Eleventh Circuit rejected this argument, stating, "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Id.*

Similarly, in *Cordoba v. Dillard's, Inc.*, the Eleventh Circuit affirmed a district court decision rejecting a plaintiff's argument that her employer had constructive knowledge of her disability. 419 F.3d 1169 (11th Cir. 2005). There, the plaintiff showed that other employees knew she had a heart condition requiring surgery, watched her have heart palpitations at work, and saw her leave to go to the emergency room because of her heart problems. *Id.* at 1183. Yet the court of appeals found this insufficient, holding that "discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Id.* at 1183 (quoting *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001)).

*Morisky* and *Cordoba* make clear that an employee has to tell his employer about his specific disability before the ADA triggers an obligation to accommodate him or

refrain from firing him because of the disability. This notice rule is all the more important under the ADAAA's incredibly expansive definition of "disability," which makes just about anyone disabled so long as he is anything less than perfectly healthy. A contrary rule would require employers to don white coats and diagnose (correctly, no less) employees having any potentially health-related difficulties at work, and then proactively accommodate them on pain of liability under the ADA. Most employers would lack the capacity to make the necessary medical findings even if they could constantly monitor their employees' health. And it would make little sense to put the burden on the party with relatively less knowledge about the possible disability (the employer with some inkling that the employee has a health problem) instead of on the party with relatively more knowledge about it (the employee who is actually experiencing the symptoms, knows his medical history, and has firsthand knowledge about how it affects his job performance). *See Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) ("The ADA does not require clairvoyance."); *Fussell v. Ga. Ports Auth.*, 906 F. Supp. 1561, 1569–70 (S.D. Ga. 1995) ("the ADA claimant . . . is in the best position to know what accommodation is needed"). Thus Howard needs to produce evidence that STERIS, by way of a company decisionmaker, had actual knowledge of his alleged disability.

Attempting to meet this burden, he first points to an encounter with Thomas and then to one with McBride that he says put STERIS sufficiently on notice of his disability. The first exchange occurred when STERIS hired Howard in the mid-1980s. At the time, Howard told Thomas that he "was happy to work second shift because [he] had problems with sleeping and drowsiness." (Howard Decl. ¶ 18.) The second instance occurred sometime in 2004 or 2005 when McBride caught him sleeping at a meeting with high-

ranking, out-of-state officials and then publicly upbraided him. (*Id.* at ¶ 13; Holston Decl. ¶ 7; O. Thomas Dep. ¶ 9.)

Neither of these incidents suffices. Howard's statement to Thomas—which he made more than 30 years before his firing—is exactly the type of "[v]ague or conclusory statement[] revealing an unspecified incapacity [that isn't] sufficient to put an employer on notice of its obligations under the ADA." *Morisky*, 80 F.3d at 448. Many non-disabled people have trouble sleeping or suffer from daytime drowsiness; these problems can arise from poor sleep habits and general boredom at work just as readily as they can result from an actual disability like narcolepsy or Graves' disease. An employer is in no position to sort out which is which, even if a decisionmaker hears about or sees the employee's symptoms firsthand. *See, e.g.*, *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) ("The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."); *Van Compernolle v. City of Zeeland*, No. 1:05-cv-133, 2006 WL 1460035, at *11 (W.D. Mich. May 24, 2006) ("absent knowledge of a disability, speculation about the cause of a problem does not impute knowledge to Defendants."). So like the decisionmaker in *Morisky* who lacked sufficient notice of the plaintiff's cerebral palsy despite knowing she had taken special education classes, McBride lacked adequate notice of Howard's sleep-related disability even though he caught him sleeping at a meeting four or five years earlier. *See also Lewis v. Zilog*, 908 F. Supp. 931, 948–50 (N.D. Ga. 1995) (finding supervisor's generalized knowledge that plaintiff had "some sort of medical condition related to stress" did not establish employer's awareness of specific disability). The same goes for Howard's argument that Williams should have inferred that he had a disability based on the times he fell asleep during meetings or made reference to having a

"problem." *See Zillyette v. Capital One Fin. Corp.*, 1 F. Supp. 2d 1435, 1443 (S.D. Fla. 1998) (holding employer lack sufficient notice of plaintiff's disability stemming from HIV even though employer knew of plaintiff's excessive absenteeism and diabetes, and received a doctor's note saying plaintiff suffered from "an immunological disease").

The most persuasive argument Howard makes about STERIS's having notice relates to how he told Williams and another supervisor that his doctor had diagnosed him with Graves' Disease. He even testified that one of them asked him to spell "Graves," which he did. (Howard Dep. 163.) Under STERIS policy, Howard argues, the two supervisors had to tell Thomas about his diagnosis so "that employee, that supervisor, and the HR manager" (McBride Dep. 23–24) could engage in an interactive process. But even assuming one could impute knowledge of Howard's Graves' Disease to Thomas, Thomas would still have no idea that the diagnosis would render Howard disabled. That is, the ADA only requires employers to account for *known* disabilities when making employment decisions, *see* 42 U.S.C. § 12112(b)(4), so just because an employer knows an employee has some sort of impairment doesn't mean that the employer automatically knows the impairment substantially limits a major life activity of that employee.[3] *See, e.g.*, *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (finding summary judgment appropriate for employer in part where plaintiff "never told [her] supervisors that the medications she was taking in mid-1995 left her uncontrollably drowsy on the job until after she committed the offense of twice sleeping on the job, a work rule violation she knew would mandate her discharge"); *Taylor v. Principal Fin. Group, Inc*., 93 F.3d 155, 163 (5th Cir. 1996) ("For purposes of proving ADA

---

[3] In his brief, Howard implicitly admits that STERIS remained in the dark about his alleged disability by continually arguing that STERIS knew of his "impairment" and that he had "a sleep-related condition." (ECF No. 40-1 at 42.)

discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability."); *Sever v. Henderson*, 381 F. Supp. 2d 405, 419–20 (E.D. Pa. 2005); *Gesegnet v. J.B. Hunt Trans., Inc.*, No. 3:09-cv-828, 2011 WL 2119248, at *4–5 (W.D. Ky. May 23, 2011). Because Howard has failed to show that STERIS had actual knowledge of his disability, no reasonable jury could infer the company discriminated against him because of it.

Though Howard failed to make out a prima facie case, the Court will address the rest of the burden-shifting approach out of an abundance of caution. To recap, after a plaintiff makes out a prima facie case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the challenged action. To satisfy the burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257. "This intermediate burden is 'exceedingly light.'" *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)).

STERIS has easily met its burden. Bridges and Williams testified that they saw Howard sleeping at his workstation on June 11. (Williams Dep. 46–49.) Moreover, Thomas produced a copy of STERIS's employee manual, which makes sleeping on the job a fireable offense. (Thomas Aff., Ex. C.) Yet Howard tries to call into question the

legitimacy of STERIS's reason and the way the company applied its rules by citing to two Ninth Circuit cases—*Dark v. Curry*, 451 F.3d 1078 (9th Cir. 2006) and Humphrey v. Memorial Hospitals Association, 239 F.3d 1128, 1139–40 (9th Cir. 2001)—and arguing that "reliance on disability-related misconduct is not a valid, nondiscriminatory reason for adverse action as a matter of law." (ECF No. 40-1 at 48.)

The Court finds Howard's reliance on *Dark* and *Humphrey* unpersuasive.[4] Generally speaking, an employer lacking knowledge of an employee's disability can fire him for misconduct. *See, e.g.*, *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997) ("Misconduct, even misconduct related to a disability, is not in itself a disability, and an employer may fire an employee on that basis.") And even if hindsight later reveals the employee's disability caused the misconduct, the employer has no duty to go back and retroactively excuse the misconduct. *See* EEOC, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* 23 (2002) (stating employer doesn't have to "withhold discipline or termination of an employee who, because of a disability, violated a conduct rule," because "reasonable accommodation is always prospective.") For example, in *Brohm v. JH Properties, Inc.*, the defendant fired the plaintiff for sleeping on the job even though the plaintiff suffered from chronic sleep deprivation brought on by sleep apnea. 149 F.3d 517, 521 (6th Cir. 1998). The *Brohm* court held that the employer had no duty to excuse the misconduct, because "[t]he fact that [the plaintiff] was terminated for sleeping on the job does not establish discrimination on the basis of his chronic sleep deprivation." *Id.* at 521–22. The

---

[4] Both cases are easily distinguishable. *Dark* dealt with a situation where the employer admitted that it fired the employee based on his medical condition, which created a genuine issue about whether the employer fired the plaintiff based on his disability rather than because he violated a work rule. *Dark*, 451 F.3d at 1085. Howard has failed to produce evidence of this sort. In *Humphrey*, the plaintiff made a specific accommodation request whereas Howard never did. 239 F.3d at 1140.

same is true here. STERIS has therefore stated a legitimate, non-discriminatory reason for firing Howard: his sleeping on the job violated a company rule.

Once an employer provides a legitimate, non-discriminatory reason for the contested action, the employee has to "meet that reason head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citing *Alexander v. Cnty. of Fulton*, 207 F.3d 1303, 1341 (11th Cir. 2000)). To do this, the plaintiff has to show that his "employer's explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). But "the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*; *see also Johnson v. Rice*, 237 F. Supp. 2d 1330, 1337 (M.D. Fla. 2002) (holding plaintiff's "gut feeling" transfer was retaliatory did not suffice). To the contrary, he has to show "*both* that the reason was false, *and* that discrimination was the real reason" why the employer fired him. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 512 n.4 (1993). He can do this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Or he can produce other evidence that would permit "the jury to reasonably disbelieve the employer's proffered reason." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of material fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." *Id.*

Howard relies on three pieces of evidence to try to show pretext. First, he reiterates the argument that STERIS fired him for misconduct caused by his disability and that this amounts to discrimination based on his disability. The Court has already

rejected this argument and need not address it again. Second, he contends that STERIS violated its own policies by failing to levy a lesser punishment before firing him, arguing that this creates an inference of pretext. Third, he claims that STERIS inconsistently applied its policy barring sleeping on the job, hence raising an inference of discrimination.

The flaw in these arguments, however, is the same as the one in his prima facie case: his failure to produce evidence allowing a reasonable juror to infer STERIS had actual knowledge of his disability undercuts any claim that the company discriminated against him because of it.[5] In other words, STERIS has no freestanding obligation under federal law to follow its own policies or apply them consistently. Rather, contract law governs the employment relationship, and either party can end the arrangement at will (absent an agreement to the contrary). *See, e.g.*, *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006) ("he was an employee at will who could be fired for any reason not forbidden by the . . . law, such as failing to trim his mustache or eating with his fork in his left hand."); *Lloyd v. Montgomery Hous. Auth.*, ___ F. Supp. 2d ___,

---

[5] It is also far from clear that Howard has produced sufficient evidence for a reasonable juror to conclude STERIS violated its own policies or applied them to Howard inconsistent with the company's established practice. STERIS's handbook gives company decisionmakers ample leeway to select a punishment for an employee sleeping on the job: it "may" result in firing, which means that a lesser punishment "may" also be appropriate. And as for the claimed inconsistency in how STERIS applied its anti-napping policy, Howard seems to argue that the company should have fired him *earlier* than it did because he often slept on the job. It's difficult to see how a reasonable juror might conclude that cutting Howard a break on multiple occasions shows intent to discriminate against him. One could see things differently, of course, if supervisors continually overlooked *another employee's* sleeping on the job but came down hard on Howard and fired him after the first incident. But he has produced no evidence that STERIS applied the policy any differently to similarly situated, non-disabled employees. In fact, the evidence shows that STERIS fired three other employees caught sleeping on the job, none of whom had a disability.

No. 2:10-cv-1103, 2012 WL 1466561, at *10 (M.D. Ala. Apr. 27, 2012) (Fuller, J.) ("Contract law typically governs the relationship between employer and employee, and absent an agreement to the contrary, either party can terminate the relationship at will. This allows employers and employees the flexibility to end or make changes to the employment relationship without the threat of costly judicial intervention."). So an employer's decision to disregard its own policies or apply them unevenly only becomes relevant in a discrimination case if it would allow a reasonable juror to infer the employer used the rule as cover to fire the employee for having a protected trait, like a disability. And it follows that for an employer to use the rule to cover up impermissible discrimination based on a protected trait, it has to first know about that trait. Because Howard has failed to produce evidence that STERIS had actual knowledge of his disability, no reasonable juror could conclude that the company used its policies as pretext to conceal impermissible discrimination. Summary judgment is therefore due to be granted on Howard's disparate treatment claim.

### 2.    Howard's failure to accommodate claim

Discrimination under the ADA includes not only adverse employment actions but also an employer's refusal to make "reasonable accommodations" to a plaintiff's known disabilities. 42 U.S.C. § 12112(b)(5)(A); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998). As a result, an ADA plaintiff can prove discrimination by showing his employer failed to provide a reasonable accommodation. To do so, the plaintiff has to identify a reasonable accommodation that would allow him to perform the job. *Terrell v. U.S. Air*, 132 F.3d 621, 624 (11th Cir. 1998). "An employee with a disability is not entitled to the accommodation of his choice, but only to a reasonable

accommodation." *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010) (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)).

Howard identifies three potential actions STERIS could have taken to accommodate him. First, the company could have continued to allow other employees to wake him up by spraying him with a water bottle, tapping him, or kicking his chair. Second, the company could have allowed him to retire early as promised by Thomas, STERIS's human resources manager. Or third, STERIS could have let him take time off under the Family and Medical Leave Act (FMLA) so he could get treatment and recuperate. He further argues that he had no duty to specifically ask for an accommodation, because an employer's duty to provide one "is triggered where the employer knew or should have known the employee was disabled, as Defendant did here." (ECF No. 40-1 at 51–52 (citing *Brady v. Wal-Mart Stores*, 531 F.3d 127, 135 (2d Cir. 2008).)

Unfortunately for Howard, he is mistaken about the current state of accommodation law. Under Eleventh Circuit precedent, "the defendant's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Baston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 2007); *Kintz v. United Parcel Serv., Inc.*, 766 F. Supp. 2d 1245, 1256 n.6 (M.D. Ala. 2011) (Fuller, J.). For instance, in *Jackson v. Boise Cascade Co.*, the district court rejected the plaintiff's argument that his employer "should have known" he needed an accommodation for his narcolepsy before firing him for sleeping on the job. 941 F. Supp. 1122 (S.D. Ala. 1996). In granting summary judgment, the court reasoned that, the "essence of the ADA claim is discrimination in the workplace, which means while the employee is on the job. Hence, the employee must show that he requested a

reasonable accommodation while on the job." *Id.* at 1128. Just like the plaintiff in *Jackson*, Joe Howard never asked STERIS for an accommodation before a supervisor caught him sleeping during work. This disposes of two of his three proffered accommodations—that STERIS should have allowed him to retire early or take time off under the FMLA—because he didn't request either accommodation before a supervisor caught him snoozing.

Howard's final proposed accommodation is that STERIS should have kept doing what it had already been doing: allowing his supervisors and coworkers to rouse him when he drifted off. But once again, he never informed STERIS that he thought the company was accommodating him by letting his coworkers spray him with water or scare him out of sleep. Thus he has no right to force STERIS to continue with this accommodation-by-happenstance. *Cf. Hill v. Kansas City Area Hosp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (holding employee failed to make timely accommodation request when she "waited until after she committed the offense of twice sleeping on the job, a work rule violation she knew would mandate her discharge"); *Davila v. Qwest Corp.* 113, F. App'x 849, 854 (10th Cir. 2004) ("excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA"). Nor could a reasonable juror infer that STERIS knew it was accommodating Howard by allowing his coworkers to spray him with water or scare him when this type of horseplay violates company policy. (Williams Dep. 35; Thomas Dep. Ex. 16.) By the same token, the ADA imposes no duty on STERIS to investigate Howard's need for an accommodation that he didn't ask for, so he cannot argue that STERIS had to initiate a discussion about accommodating him. *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997); *McKane v. UBS Fin. Servs.*,

363 F. App'x 679, 681 (11th Cir. 2010) ("the ADA provides no cause of action for failure to investigate possible accommodations"); *Webb v. Donley*, 347 F. App'x 443, 446 (11th Cir. 2009) ("if the employee does not identify a reasonable accommodation, the employer does not have to enter into an interactive dialogue"). Accordingly, his claim based on STERIS's alleged failure to accommodate fails too.

### 3.      Howard's retaliation claim

To press a retaliation claim, a plaintiff must show that he opposed or participated in the investigation of an unlawful practice and suffered an adverse employment action as a result. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). A plaintiff attempting to make this showing without direct evidence must rely on the familiar burden shifting approach. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Howard, however, failed to respond to STERIS's argument that he could neither make out a prima facie case of retaliation nor show that the stated reason the company fired him amounted to pretext used to conceal a retaliatory motive. Howard's failure to respond means that summary judgment is due to be granted in STERIS's favor on his retaliation claim. *Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd* 44 F.3d 1008 (11th Cir. 1995) ("summary judgment is appropriate since [plaintiffs] failed to respond to [defendant's] argument on this issue"); *Evans v. Pemco Aeroplex Co.*, No. 96-cv-2801, 1998 WL 1048470, at *12 (N.D. Ala. Feb. 23, 1998) (granting summary judgment on retaliation claim after plaintiff failed to respond to defendant's argument, stating, "summary judgment therefore is appropriate for that reason alone"); *Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997).

**C.      Howard's age discrimination claims**

Howard included two age discrimination claims in his complaint. One alleges

discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§

621–34. The other alleges discrimination under Alabama's Age Discrimination in

Employment Act (AADEA), Ala. Code §§ 25-1-20 to -25. Because the Acts are nearly

identical, the Court will apply the same standards to both claims. *See Newman v. Career

Consultants, Inc.*, 470 F. Supp. 2d 1333, 1348 (M.D. Ala. 2007).

The ADEA makes it illegal for an employer "to discharge any individual or

otherwise discriminate against any individual" because of his age. 29 U.S.C. § 623(a)(1).

Unlike other discrimination statutes, the prohibition against discrimination only applies to

some employees; namely, "individuals who are at least 40 years of age." *Id.* § 631(a). To

establish a facial case of age discrimination, a plaintiff has to show he belonged to a

protected class, held the proper job qualifications, suffered an adverse employment

action, and that his employer replaced him with someone substantially younger.

*O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (holding ADEA

plaintiff must show someone "substantially younger" replaced him but not necessarily

someone under 40); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.

1998). On the last element, the employee can also succeed by showing that the employer

treated a similarly situated employee outside of his protected class more favorably. The

burden-shifting framework that applies in Title VII and ADA cases does not apply to

ADEA claims. *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009) ("This Court has never

held that this burden-shifting framework applies to ADEA claims. And, we decline to do

so now."); *Mora v. Jackson Memorial Found., Inc.*, 597 F.3d 1201, 1203–04 (11th Cir.

2010). And perhaps most importantly, "the Supreme Court ruled out the idea of a 'mixed

motive' ADEA claim, instead requiring plaintiffs to show that age was the 'but for' cause of an employment action." *Mora*, 597 F.3d at 1204 (citing *Gross*, 557 U.S. at 175).

Howard can easily satisfy the first three elements of his prima facie case: he was over 40 and held the proper qualifications when STERIS fired him. On the last element, he argues a reasonable juror could infer STERIS fired him due to his age, because even though the company never hired a permanent replacement, it still rotated younger workers into his spot in the assembly cell. Further, he contends that STERIS aimed its reduction in force program at older employees (those with more than 15 years of service with the company), and thus a reasonable juror could conclude that because the company sought to push out older employees, it never would have fired Howard but for his age.[6]

Howard's arguments have all have a number of fatal flaws. First, Howard relies solely on Williams's testimony that, if he had to guess, he thought six of the seven employees who rotated through the assembly cell were younger than Howard. (Williams

---

[6] During his deposition, Howard claimed that STERIS refused to discipline other employees for other forms of misconduct, which, he said, gives rise to an inference of age discrimination. He failed to raise this argument in his brief contesting summary judgment, however, so the Court considers the argument waived. Either way, he failed to put forward any similarly situated comparators that STERIS treated more favorably. To allow a reasonable juror to use another employee as a comparator, the plaintiff's conduct needs to be "nearly identical" to that of the potential comparator who received better treatment. *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1369–69 (11th Cir. 1999)). Howard identified three employees—Clemmie Blair, Jerry Johnson, and Randy Bush—that STERIS refrained from firing for various types of misconduct. Yet none of these potential comparators were caught sleeping on the job: Blair spent too much time remaining idle while on the clock (Howard Dep. 75); Johnson made careless errors when creating company records (id. at 77–78, 88–89); and Bush often snuck off to smoke (id. at 82). Unlike getting caught sleeping on the job, none of the offenses call for automatic termination under STERIS's policies. (Thomas Aff. ¶ 14.) The differences between Howard's actions and those of the suggested comparators, combined with the differences in STERIS's policies for the various types of misconduct, would require the Court to find that, even if Howard didn't abandon this argument by failing to raise it in his opposition to STERIS's motion, Howard can use neither Blair nor Johnson nor Bush as comparators.

Dep. 111–13.) But does this testimony suffice to show that someone substantially younger replaced him? It decidedly does not. Williams gave only a guess about the relative youth of the workers who rotated through the cell—he never indicated their exact ages. And without knowing *how much* younger they were than Howard, no reasonable juror could conclude they were *substantially* younger than him. Besides, an employer only replaces an employee by hiring or reassigning someone else to do his duties; it does not suffice to show that the employer merely spread around the plaintiff's work "among other existing employees already performing related work." *Puckett v. McPhillips Shinbaum, L.P.*, No. 2:06-cv-1148, 2008 WL 906569 (M.D. Ala. Mar. 31, 2008) (quoting *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Here, Williams testified that STERIS spread Howard's duties out among existing employees "to fill the gaps." (Williams Dep. 112.) Because Howard failed to produce evidence that STERIS replaced him—let alone replaced him with someone substantially younger—his first argument in favor of his age discrimination claim fails.

Howard's argument about STERIS's reduction in force program likewise fails to pass muster at the summary judgment stage. It is true that offering early retirement to *longer serving* employees will almost always mean inducing some *older* employees to retire early. Here, STERIS did exactly that by tying the amount of money it paid a retiring employee to his service time and hence to his age. But the ADEA specifically permits this type of "voluntary early retirement incentive plan." 29 U.S.C. § 623(f)(2)(B)(ii). Howard, moreover, seems to suggest that STERIS's *refusal* to let him participate in the programs shows the company intended to discriminate against him. This makes no sense; after all, if STERIS intended to use the early retirement program to get rid of older employees like Howard, then why *wouldn't* the company let him participate in it?

Finally, Howard's misconduct is in any event fatal to his age discrimination claim. To prove that but for his age STERIS never would have fired him, Howard has to put forth evidence that STERIS used his sleeping on the job as pretext for impermissible discrimination. But he never did so. In fact, the evidence he produced suggests the exact opposite: McBride and Thomas were, like Howard, both over 50 years of age when they decided to fire him. And because they were in the same protected class, it makes it unlikely they would discriminate against him on the basis of a shared characteristic. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("Elrod faces a difficult burden here, because all of the primary players behind his termination—Rives, Malone and Merrill—were well over age forty and within the class of persons protected by the ADEA. These three are more likely to be the victims of age discrimination than its perpetrators."). Thus STERIS's unrebutted reason for firing Howard bars him from proving that but for his age the company would have refrained from taking the adverse employment action.[7]

---

[7] The same goes for his allegation that STERIS fired him because of his disability. Indeed, this contention necessarily undermines his claim that but for his age STERIS never would have fired him. *Cf. Culver v. Birmingham Bd. of Ed.*, 646 F. Supp. 2d 1270 (N.D. Ala. 2009) (requiring plaintiff to elect whether he wanted to pursue an ADEA or Title VII claim because of the but for standard governing age discrimination suits).

## VI. Conclusion

After having fully considered the parties' briefs, and for the reasons discussed above, it is hereby ORDERED as follows:

1.  STERIS's Motion for Summary Judgment Based on Collateral Estoppel (ECF No. 28) is DENIED.

2.  STERIS's Motion for Summary Judgment (ECF No. 26) is GRANTED on all of Howard's claims.

Done this the 17th day of August, 2012.

_____
Mark E. Fuller
UNITED STATES DISTRICT JUDGE